UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

**19 21402**

| | |
|---|---|
| UNITED STATES OF AMERICA and the State of FLORIDA, ex rel. AMBER BOONE <br><br> Plaintiffs, <br><br> vs. <br><br> ALL HEART PHARMACY INC., UPTOWN DRUGS PHARMACY, A/K/A AMERICO RX LLC, RASHA SHENODA, MED SOLUTIONS PHARMACY, INC., MED-CARE PHARMACY, A/K/A MED-CARE MEDICAL, INC., AKRAM GIRGIS and AMGAD GIRGIS <br><br> Defendants. | Case No. <br><br> COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT   CIV-COOKE <br><br> **FILED IN CAMERA AND UNDER SEAL** <br> **PURSUANT TO 31 U.S.C. §3730(b)(2)** <br><br> **JURY TRIAL DEMANDED**   Sealed <br><br> FILED BY_____D.C. <br> APR 1 2 2019 <br> ANGELA E. NOBLE <br> CLERK U.S. DIST. CT. <br> S. D. OF FLA. - MIAMI |

/GOODMAN

## COMPLAINT

Pursuant to the *qui tam* provisions of federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or the "FCA"), *qui tam* Plaintiff-Relator Ms. Amber Boone (hereinafter "Relator"), on behalf of the United States of America and the State of Florida for this Complaint against All Heart Pharmacy, Inc., Uptown Drugs Pharmacy, a/k/a Americo Rx LLC, Rasha Shenoda, Med Solutions Pharmacy, Inc., Med-Care Pharmacy, a/k/a Med-Care Medical, Inc., Akram Girgis and Amgad Girgis ("Defendants"), alleges as follows:

## I.   INTRODUCTION AND OVERVIEW

1.      For years, Defendant pharmacies have sustained an immensely profitable kickback scheme built on three pillars: specializing in a few lucrative prescription pharmaceuticals and/or compounding pharmaceuticals that are highly reimbursed under Medicare, Medicaid or TRICARE, spending millions and paying kickbacks to access beneficiaries and market these products regardless of whether patients need or want them, and then routinely waiving co-payments to induce beneficiaries to accept and keep the products.



2

2.      Defendants advanced this scheme through two separate but interrelated networks. Defendants All Heart and Uptown Drugs Pharmacy were, and remain, owned and controlled by Defendant Rasha Shenoda. These three Defendants – All Heart, Uptown, and Ms. Shenoda – will be collectively referred to in this Complaint as the "All Heart Defendants."

3.      Prior to creating All Heart, Ms. Shenoda had been a longtime employee of Defendant Med-Care Pharmacy. Defendants Med Solutions and Med-Care operate a multi-state network of retail pharmacies, and are owned and controlled by Defendant brothers Akram Girgis and Amgad Girgis. These four Defendants – Med Solutions, Med-Care, and the Girgis brothers – will be collectively referred to in this Complaint as the "Med-Care Defendants."

4.      Relator Ms. Amber Boone discovered the scheme as an employee of Defendant All Heart Pharmacy.  As described in detail below, Relator quickly learned that All Heart Defendants copied the long-standing (and even more lucrative) fraud perpetuated by the Med-Care Defendants. Relator witnessed shared personnel between Med-Care and All Heart Defendants describing the ongoing schemes and business practices. Relator even became aware of Med Solutions and Med-Care employees coaching Ms. Shenoda on how to avoid detection by regulators and auditors by fabricating documentation. In sum, Defendants acted in concert to defraud federal healthcare programs.

5.      The All Heart and Med-Care schemes focused on producing lucrative prescription topical ointments to treat pain and dry skin / psoriasis. As operations of different scales, the All Heart and Med-Care Defendants specialized in slightly different drug formulations.

6.      Defendant All Heart pharmacy specialized in four non-compounded products: prescription lidocaine topical cream or patches, prescription diclofenac sodium topical cream, prescription calcipotriene cream and a prescription fluocinonide cream. These products were chosen for enormous profitability and low risk of side-effects when widely dispensed – lidocaine creams, for example, were at certain points reimbursed under Medicare at $2000 per 400g jar, when the cost of purchase was only ~$240.

3

7.     In May of 2018, Defendant All Heart Pharmacy began attempting to mass-produce compounded topicals, focusing on a hydrocortisone and diclofenac solution for the treatment of dry skin.

8.     Med-Care Defendants have specifically specialized in abusing high reimbursement rates for compounded prescription pharmaceuticals for many years.

9.     Federal healthcare programs cover, in appropriate circumstances, the custom creation of prescription formulations by retail pharmacies. Such custom made-to-order prescriptions, also known as "compounded" drugs, may be appropriate where a patient has a legitimate medical need for products that cannot be mass-produced by pharmaceutical companies. A patient may require, for example, a pain medication that is only commercially available as a pill, but not be capable of swallowing pills: coverage of the pain medication in a compounded liquid or topical compound would be appropriate, and could be potentially reimbursed by a federal healthcare program. Given the labor and customization that appropriate compounding calls for, compounded pharmaceuticals have been reimbursed at particularly high rates by federal healthcare programs.

10.     Med-Care Defendants, recognizing the enormous potential for profit, focused on producing and marketing a select number of highly reimbursed compounded pharmaceuticals. Rather than customizing these compounded formulas on a per patient basis, these creams were essentially produced based on pre-set formulas, chosen for maximum profitability with minimum risks. The opportunity for profit, when compounded creams were produced in this manner, could be hundred-fold.

11.     Whether compounded or non-compounded, all Defendants carefully chose their prescription topical creams for one purpose: to maximize their payout from federal healthcare programs.

12.     To push these pre-chosen products, all Defendants then paid kickbacks to third party companies to target and access federal healthcare program beneficiaries. These third party companies – also known as "lead generation companies" – gathered consumer information

4

through television commercials and internet surveys, under the guise of collecting information to provide patients with information or products tailored to their health conditions. The lead generation companies would then sell highly specific patient data to interested parties, including Defendant pharmacies. This information, or "lead", included detailed information about the patient (name, date of birth, address, current health conditions), the patient's physician (NPI, name, address, phone and fax number) as well as the patient's insurance information (bank identification number or "BIN", processor control number or "PCN", group number, and Medicare ID number).

13.     These leads therefore allowed Defendants to target patients with insurance associated with federal healthcare programs and whom had reported pain or dry skin issues. These leads also provided the necessary information to contact a patients' physician to secure a prescription.

14.     Defendant All Heart Pharmacy, for example, almost exclusively purchased leads for patients whom had indicated they had pain, dry skin, and – based upon insurance information – were federal program beneficiaries. On information and belief, All Heart purchased leads for at least 30 federal beneficiaries a day, at the rate of $150 per patient, on a daily basis. At that rate, All Heart – an operation with only one licensed pharmacist – spent approximately $1 million dollars per year on these marketing and promotional activities alone.

15.     Once Defendants had purchased access to these patients, Defendants would then engage in an aggressive – and at times purposefully misleading – campaign to contact patients and their doctors to secure a prescription for these expensive compounded pharmaceuticals.

16.     All Heart Defendants, for example, would first seek consent from beneficiaries to secure a prescription from their physician, in some instances directing staff to lie that the patients' doctor had suggested the prescription. In some instances, All Heart Defendants purchased a patient lead after the third party company had contacted the patient, at times falsely suggesting they had been in contact with the patients' physician, or were the patient's insurance representative.

17.     On calls with these prospective patients, All Heart Defendants would also routinely promise that the prescriptions would be covered entirely by insurance, and that the prescription would cost the patient nothing.

18.     All Heart Defendants would then relentlessly contact a beneficiaries' physician, making daily calls and faxes with pre-filled prescriptions until the practitioner signed the prescription. At times, All Heart Defendants falsely suggested to practitioners that the patient had pro-actively requested these prescriptions.

19.     During these calls to patients and practitioners, All Heart Defendants did not verify that these prescription pharmaceuticals were medically necessary, or that these prescriptions had been made pursuant to a valid practitioner-patient relationship. At Defendant All Heart, these pharmacy prescriptions were also regularly generated and filled with no licensed pharmacist on premises or immediately available.

20.     On information and belief, the Med-Care Defendants also purchase access to Medicare, Medicaid and TRICARE beneficiaries to engage in aggressive, if not misleading, sales campaigns. Based on Ms. Shenoda's accounts to Relator, All Heart's practice of purchasing patient referrals from "lead generation companies" replicated what she observed as a Med-Care employee. All Heart employees used a call script from Med-Care to make sales pitches to patients. The Med-Care Defendants' solicitation practices were further corroborated by conversations with current and former employees, and Relator's own very brief employment at Med-Care Pharmacy.

21.     After sending pharmaceutical creams to these targeted patients, Defendants also routinely made little to no effort to collect co-pays from patients for these prescriptions.

22.     When All Heart's routine waiver of copays was audited by insurance companies participating in the Medicare Part D program, staff at All Heart were directed to falsify backdated invoices to create the appearance of attempting to collect co-pays from patients.

23.     Defendant All Heart, specifically through Ms. Shenoda, immediately refunded the co-pays to patients after charging their credit cards, and maintained and submitted the original credit card receipts as fraudulent evidence that co-pays were collected.

24.     Staff at Defendants Med-Care and Med Solutions reported operating a credit card machine specifically designed to fabricate, *en masse*, such false backdated invoices.

25.     On information and belief, Defendants have received tens of millions of dollars in reimbursements from federal healthcare practices through this scheme.

26.     Relator, Ms. Amber Boone, has direct, personal knowledge of the information alleged above, as she was a pharmacy technician and pharmacy manager at All Heart pharmacy from 2016 to 2018.

27.     Ms. Boone interacted with shared staff at Defendants Med-Care, Med Solutions and All Heart whom witnessed similar conduct across each practice, and even exchanged information on strategies to avoid detection of the scheme in audits. All Heart's owner and her direct supervisor – Ms. Rasha Shenoda – had worked at Defendant Med-Care for eight years before starting All Heart Pharmacy. Ms. Shenoda repeatedly told Relator that All Heart's business model – focusing on high-reimbursement topical creams, purchasing access to federal beneficiaries, and routinely waiving co-payments to induce patient use of the creams – directly replicated Med-Care and Med Solution's longstanding and extremely lucrative practices.

28.     Relator Ms. Amber Boone seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that Defendants knowingly made or caused to be made in connection with its fraudulent scheme.

II.     **PARTIES**

29.     Relator Ms. Amber Boone was employed at All Heart Pharmacy from July 2016 to August 2018, serving as a Pharmacy Technician until October 2017, when she was promoted to Pharmacy Supervisor. Ms. Boone was hired by, and reported directly to, the owner and sole licensed pharmacist on staff, Ms. Rasha Shenoda. Prior to working at All Heart, Ms. Boone was

7

also very briefly employed by Defendant Med-Care Pharmacy. Ms. Boone completed her

Pharmacy Technician's certificate at Everest University-Pompano Beach in March 2014.

      30.    Defendant All Heart Pharmacy, Inc. is a retail pharmacy headquartered at 911 SE

6th Avenue, No. 105, Del Ray Beach, FL 33483. All Heart's Registered Agent – the sole

licensed pharmacist on staff – is Rasha Shenoda, Ms. Boone's direct supervisor.

      31.    Defendant Uptown Drugs Pharmacy, a/k/a Americo Rx LLC, is a pharmacy

corporation headquartered at 14737 Champaign Road, Allen Park, MI 48101. Uptown Drugs'

corporate manager is Rasha Shenoda. Uptown Drugs operates retail pharmacy operations serving

patients in Michigan, Utah, and North Dakota.

      32.    Ms. Rasha Shenoda, in her individual capacity. At all times relevant in the

Complaint, Ms. Shenoda served as an owner of Defendants All Heart Pharmacy, Inc. and

Uptown Drugs, and had the authority to make decisions on each company's behalf.  Ms.

Shenoda's listed contact address, as the Registered Agent of All Heart Pharmacy, is 3598

Northeast 6th Dr., Boca Raton, FL 33431. Ms. Shenoda knew of the fraud alleged herein,

knowingly participated in it, and personally benefitted from the improper payments her company

was paid by federal healthcare programs.

      33.    Defendant Med Solutions Pharmacy, Inc. is a retail pharmacy headquartered at

1078 S. Powerline Road, Deerfield Beach, FL 33442. Med Solutions' Registered Agent is

currently Sherine Bahna. In prior filings, Med Solutons' Registered Agent was Akram Girgis,

brother to Amgad Girgis (the manager and owner of Defendant Med-Care, below). Ms. Boone

was told on numerous occasions by Ms. Shenoda that Mr. Akram Girgis, Mr. Amgad Girgis, and

Mrs. Sherine Bahna had previously worked together, and remain close.

      34.    Defendant Med-Care Pharmacy, a/k/a Med-Care Medical, Inc. is a pharmacy

corporation headquartered at 1052 S. Powerline Road, Deerfield Beach, FL 33442. Med-Care's

Registered Agent and Manager is Amgad Girgis. Med-Care operates retail pharmacy operations

serving patients in Florida, Maine, Montana, North Dakota, and New York.

8

35.     Mr. Akram Girgis, in his individual capacity. At all times relevant in the Complaint, Mr. Akram Girgis served as an owner of Defendants Med Solutions and Med-Care Pharmacy, and had the authority to make decisions on each company's behalf.  Mr. Akram Girgis's listed contact address, as an officer of Med-Care Pharmacy, is 2 Ocean Place, Highland Beach, FL 33487. Mr. Akram Girgis knew of the fraud alleged herein, knowingly participated in it, and personally benefitted from the improper payments his company was paid by federal healthcare programs.

36.     Mr. Amgad Girgis, in his individual capacity. At all times relevant in the Complaint, Mr. Amgad Girgis served as an owner of Defendants Med Solutions and Med-Care Pharmacy, and had the authority to make decisions on each company's behalf.  Mr. Amgad Girgis's listed contact address, as an officer of Med-Care Pharmacy, is 9524 Savona Winds Dr., Delray Beach, FL 33446. Mr. Amgad Girgis knew of the fraud alleged herein, knowingly participated in it, and personally benefitted from the improper payments his company was paid by federal healthcare programs.

## III.     JURISDICTION AND VENUE

37.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

38.     Although the issue is no longer jurisdictional, the public disclosure provisions of the federal False Claims Act do not bar this suit.  To the extent there has been a public disclosure of the allegations or transactions alleged in this complaint, Relator is an original source of the information on which this complaint is based.  She reported the information to the Government before any public disclosure of the allegations or transactions, have information that is

independent of the public disclosure and that information materially adds to any information that the Government may have.

39.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States.  Moreover, the Defendants can be found to have transacted business in the Southern District of Florida.

40.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because the Defendants can be found in and/or transact or have transacted business in this district.  At all times relevant to this Complaint, Defendants regularly conducted substantial business within this district and maintained employees and offices in this district.

## IV.     APPLICABLE LAW

### A.     The False Claims Act

41.     The FCA was originally enacted during the Civil War.  Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States to recover losses sustained as a result of fraud against it.  The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

42.     The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval and knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(A)-(B).  Any person who violates the FCA is liable for

10

a civil penalty for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

43.     For purposes of the FCA, a person "knows" a claim or statement is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that a defendant specifically intended to commit fraud. *Id.*

44.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery. Such an action is known as a *qui tam* action and the individual bringing the suit is a *qui tam* relator. The FCA requires that the *qui tam* complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

### B.     Medicare (Part D)

45.     Title XVIII of the Social Security Act, commonly known as Medicare, is a federally funded and administered health insurance program, primarily for elderly and disabled persons. Title XIX of the Social Security Act, known as Medicaid, is a federal/state entitlement program that pays for medical assistance for individuals and families with low incomes and resources. The Medicare and Medicaid programs are administered through the Centers for Medicare and Medicaid Services ("CMS"), an operating division of the U.S. Department of Health and Human Services ("HHS").

46.     Medicare consists of four parts: Hospital Insurance Benefits (Part A), Supplemental Medical Insurance Benefits (Part B), Medicare Advantage (Part C), and the Voluntary Prescription Drug Benefit Program (Part D). Medicare Part A covers inpatient hospital, home health, skilled nursing facility, and hospice care. Medicare Part B covers physician, outpatient hospital, home health, and other services. Both Part A and Part B operate

11

on a fee-for-service basis, meaning that Medicare pays hospitals, physicians, and other health care providers directly for each service they provide to a Medicare beneficiary.

47.     Congress created Medicare Part D in 2003 through section 101 of the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare beneficiaries.  Part D provides subsidized access to prescription drug insurance coverage on a voluntary basis to individuals entitled to Part A or enrolled in Part B who pay a premium (also known as "beneficiaries" or "members").  Part D also provides premium and cost-sharing subsidies for low-income enrollees.  Beneficiaries who qualify for both Medicare and Medicaid automatically receive the Part D benefit.  All Part C Medicare Advantage plans, except Private Fee for Service plans, must also offer an option that includes the Part D drug benefit.

48.     The United States does not pay pharmacies directly for providing covered drugs to Medicare Part D beneficiaries.  Rather, the United States pays private companies that contract with CMS.  The private companies that contract with CMS to offer Part D coverage are known as "Part D plan sponsors" or "Part D sponsors," which are typically private insurance companies. Part D sponsors may offer three types of plans: stand-alone PDPs, Medicare Advantage plans that provide qualified prescription drug coverage ("MA-PD"), or Program of All-inclusive Care for the Elderly ("PACE") plans.  Similar to Medicare Part C, CMS pays Part D sponsors on a capitated basis to provide services to the Medicare beneficiaries who elect to participate in their plans.

49.     At all relevant times, Medicare Part D has covered compounded prescription drugs which meet certain requirements. Because compounded drugs are not FDA-approved, they are not considered a "Part D covered drug." However, CMS allows Part D sponsors to cover a compounded drug if it (1) contains at least one active ingredient which would be covered by Part D were it dispensed separately, and (2) the drug does not contain ingredients that would be covered under Medicare Part D. *See* Medicare Prescription Drug Benefit Manual, Chapter 6, Section 10.4, *accessed at* https://www.cms.gov/Medicare/Prescription-Drug-

12

Coverage/PrescriptionDrugCovContra/Downloads/Part-D-Benefits-Manual- Chapter-6.pdf on Mar. 21, 2019. *See also* 42 C.F.R §423.120(d).

50.     Reimbursement for a compounded drug under Part D may include reimbursement for covered ingredients in the compound, as well as dispensing fees. Part D Sponsors must cover ingredients within a compounded drug which independently meet the definition of a Part D drug. 42 CFR § 423.120(d). The labor costs associated with mixing a compounded product that contains at least one Part D drug component can be included in the dispensing fee. *See* 42 CFR § 423.100.

51.     A Part D sponsor may only provide benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription. 42 CFR § 423.104. A valid prescription means "a prescription that complies with all applicable State law requirements constituting a valid prescription." 42 CFR § 423.100.

52.     Under Florida law, a "pharmacist, as an integral aspect of dispensing, shall be directly and immediately available to the patient," and "no prescription shall be deemed to be properly dispensed unless the pharmacist is personally available." 64B16-27.1001 F.S. Practice of Pharmacy.

53.     Under Florida law, pharmacy may also lose its license to dispense drugs if it dispenses a drug based on a prescription that a pharmacist knows or has reason to believe is not based on a valid practitioner-patient relationship that includes a documented patient evaluation, including history and a physical examination adequate to establish the diagnosis for which the drug is prescribed. Fla. Stat. § 465.023(1)(h).

**C.     The Medicaid Program**

54.     Medicaid is a public-assistance program created in 1965 that provides payment of medical expenses for low-income and disabled patients.  Funding for Medicaid is shared between the federal government and those states participating in the program.  Medicaid is the largest

source of funding for medical services for America's poor and disabled. Each provider that participates in the Medicaid program must sign a provider agreement with his or her state.

55.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX of the Social Security Act and with the regulations the Secretary of HHS promulgates. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

56.     Like Medicare, Medicaid covers certain compounded drugs, where the custom-made dosage was prepared and dispensed pursuant to a legitimate prescription order for a patient with an established need. Florida Medicaid, for example, covers compounded prescriptions when "at least one of the drugs in the compound drug is covered by Florida Medicaid, […] the compounded drug is not otherwise commercially available, [and] the drug is compounded as prescribed for the recipient to treat his or her specific condition." Fla. Medicaid Prescribed Drugs Services Coverage Policy Sec. 4.2.3.

57.     Although Medicaid reimbursement for specific compounded drugs varies depending on the state in which the billing is done, all services provided must meet the medical necessity threshold.

58.     Pharmacies receiving reimbursement from Medicaid must make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid.

59.     Under the Omnibus Budget Reconciliation Act of 1990 (PL 101–508), pharmacists serving Medicaid beneficiaries also hold a number of specific pharmacist-patient counseling obligations, and must "offer to discuss with each individual receiving benefits under" the Medicaid program multiple issues prior to prescribing, including the patient's whole drug

profile, possible drug interactions, possible drug side effects, and proper drug use and storage. 42 U.S.C. § 1396r-8(g)(2)(A)(ii).

60.     Florida has enacted regulations prohibiting kickbacks in connection with State Medicaid services. Pursuant to these regulations, Florida has made compliance with federal and its own state anti-kickback statutes and rules a material condition to receiving or retaining reimbursement payments from state-funded health care programs. See Fla. Stat. §§ 409.920(2)(a)(5), 409.907; Fla. Admin. Rule 59G-9.070(7)(p); Fla. Medicaid Provider Gen. Handbook at 2-12, 2-57; Fla. Medicaid Provider Enrollment App. at 9.

**D.     The TRICARE Program**

61.     TRICARE (formerly known as CHAMPUS) is a federal health care program that is administered by DHA, a component of the DOD. TRICARE provides health care insurance for active duty military personnel, military retirees, and military dependents.

62.     At all relevant times, TRICARE covered compounded drugs that are medically necessary and proven to be safe and effective. 32 C.F.R. § 199.4 (g)(15).

63.     At all relevant times, TRICARE beneficiaries were responsible for sharing the costs of compounded drug prescriptions filled by a retail or mail-order pharmacy by paying a copayment. 10 U.S.C. § 1074g(a)(6); TRICARE Reimbursement Manual, Chapter 2, Addendum B.

64.     A pharmacy seeking reimbursement from TRICARE must comply with TRICARE's anti-fraud and abuse provisions. 32 C.F.R. § 199.9(a)(4). Fraudulent situations include commission and kickback arrangements. Id. § 199.9(c)(12). Abusive situations include the routine waiver of patient copayments. Id. § 199.9(b)(1).

65.     Fraud or abuse by a pharmacy may result in the denial of the pharmacy's claims or the exclusion or suspension of the pharmacy from participation in the TRICARE program. 32 C.F.R. § 199.9(b), (f).

66.     In addition, TRICARE covers pharmacy services but requires that "pharmacies []
meet the applicable requirements of state law in the state in which the pharmacy is located." 32
C.F.R. § 199.6(d)(3); see also TRICARE Policy Manual 6010.57-M, Ch. 8, Sec. 9.1 (Feb. 1,
2008 and April 1, 2015).

67.     As noted above, Florida law does not consider a prescription valid unless made
when a licensed pharmacist is "personally available." 64B16-27.1001 F.S. Practice of Pharmacy.
Florida law also requires that prescriptions to be made pursuant to a valid practitioner-patient
relationship. Fla. Stat. § 465.023(1)(h).

**E.      The Anti-Kickback Statute**

**1.      Overview**

68.     The federal health care Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), ("AKS")
arose out of Congressional concern that financial inducements can influence health care
decisions and result in goods and services being more expensive, medically unnecessary, and
harmful to patients.  To protect the integrity of federal health care programs, Congress prohibited
the payment of kickbacks in any form, regardless of whether the kickback actually gives rise to
overutilization or unnecessary care.  The AKS also reaches kickbacks concealed as legitimate
transactions.  See Social Security Amendments of 1972, Pub. L. No. 92-603, §§242(b) and (c);
42 U.S.C. § 1320a-7b, Medicare and Medicaid Antifraud and Abuse Amendments, Pub. L. No.
95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-
93.

69.     The AKS prohibits any person or entity from making or accepting payments to
induce or reward any person for referring, recommending or arranging for the purchase of any
item for which payment may be made under a federally-funded health care program.  42 U.S.C. §
1320a-7b(b).  The statute prohibits laboratories from offering or paying any remuneration, in
cash or kind, directly or indirectly, to induce or influence physicians or others to order or
recommend laboratory services that may be paid for by federal health care programs.

70. The AKS has been interpreted to cover any arrangement where <u>one</u> purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. An opportunity to earn a fee may be sufficient to constitute an inducement, even if payments were reasonable for services.

71. Compliance with the AKS is a precondition to both participation as a health care provider in and payment under Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other federal health care programs.

72. For example, to establish eligibility and seek reimbursement from the Medicare Program, hospitals and other providers enter into Provider Agreements with CMS. As part of that agreement, the provider must sign the following certificate:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

73. Similarly, compliance with the federal AKS is a prerequisite to a provider's right to receive or retain reimbursement payments from government-funded health care programs.

74. In sum, compliance with these terms is at the essence of the bargain and material to the government's decision to pay. In order to receive payment, pharmacists who participate in federal health care programs must certify explicitly, in a provider agreement or on claim forms, that they have complied with the applicable federal rules and regulations, including specifically the AKS.

75. Any party convicted under the AKS must be excluded from federal health care programs (<u>i.e.</u>, not allowed to bill for services rendered) for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a conviction, if the Secretary of the Department of Health and Human Services ("HHS") finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary

period (in which event the Secretary must direct the relevant State agency to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

76.    The enactment of these various provisions demonstrates Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks.  Thus, compliance with the AKS is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare and other federal health care programs.

77.    Furthermore, pursuant to the Affordable Care Act passed in 2010, any claim submitted to a federal health care program that includes items or services resulting from violations of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act.  42 U.S.C. § 1320a-7b(g).

78.    The AKS contains several exceptions in which the prohibitions against providing compensation in exchange for referrals or orders do not apply. The "bona fide employment" exception provides that "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services" will not violate the AKS. 42 U.S.C. § 1320a-7b(b)(3)(B). This type of compensation to bona fide employees is exempt from the statute's prohibitions because the control that employers exercise over bona fide employees reduces the potential for abuse. *See* Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952 (July 29, 1991).

79.    As set forth in more detail below, Defendants knowingly and willfully paid remuneration to third party lead generation companies to obtain referrals for drugs reimbursed by Medicare, Medicaid, and TRICARE. At no time did Defendants have a bona fide employment relationship with the lead generation companies to whom they paid such remuneration.

80.    As set forth in more detail below, Defendants also knowingly and willfully offered and paid remuneration to patients to induce the patients to purchase drugs reimbursed by

18

Medicare, Medicaid, and TRICARE by routinely waiving copayments that the patients were obligated to pay.

## V.     ALLEGATIONS

### A.     Defendant pharmacies produced select pharmaceuticals for their immense profitability, rather than legitimate medical needs, and targeted federal healthcare programs as their primary revenue source.

81.     For years, Defendant pharmacies have sustained an immensely profitable kickback scheme built on three pillars: specializing in a few lucrative prescription pharmaceuticals which are highly reimbursed under federal healthcare programs, spending millions and paying kickbacks to access Medicare, Medicaid and TRICARE beneficiaries and market these products, then routinely waiving co-payments to induce beneficiaries to keep the products.

### 1.     All Heart Defendants

82.     Relator discovered the All Heart Defendants' business models while employed by All Heart Pharmacy from July 2016 to August 2018. As a pharmacy technician, then All Heart's pharmacy manager, Relator was directly supervised by All Heart's owner and sole licensed pharmacist, Defendant Ms. Rasha Shenoda, and observed All Heart's conduct first hand.

83.     Defendant All Heart pharmacy specialized in four products during Relator's employment. Initially, All Heart pharmacy focused on selling prescription topical creams for the treatment of pain. These included a prescription lidocaine topical cream or patches (reimbursed under Medicare at up to $2000 per 400g jar at certain points, when the cost of purchase was only ~$240), and a prescription diclofenac sodium topical cream (reimbursed under Medicare, at certain points, on up to $1,506 per tube).

84.     Between 2016 and 2018, federal healthcare programs began increased scrutiny and decreased payments for lidocaine. In response, Defendant All Heart Pharmacy began focusing on pharmaceuticals that primarily treated dry skin or psoriasis. These included a prescription calcipotriene topical creams or patches (reimbursed under Medicare, at certain points, as much as $2,000 per 240g, and $420 for a 60 patch box) and a prescription fluocinonide

topical cream (reimbursed under Medicare as much as $400 per 120g tube). On multiple occasions, Ms. Shenoda emphasized to Relator that these products were chosen for the opportunity for profitability, as well as their low risk of side-effects when widely dispensed.

85.     In May of 2018, Ms. Shenoda began to experiment with compounding formulas of her own to further increase the pharmacy's profitability. Ms. Shenoda described a plan to Relator, where she would focus on lower paying compounds to avoid raising red flags with insurers, then begin to increase the overall reimbursement profile. During this period, All Heart began piloting a compounded calcipotrene and lidocaine cream for pain (reimbursed at ~$700 under Medicare), as well a compounded diclofenac and hydrocortisone cream for dry skin (reimbursed at ~$500 under Medicare).

86.     At All Heart, prescriptions were regularly issued and filled when the sole licensed pharmacist on staff – Ms. Shenoda – was not on premises, nor readily accessible. Relator and other staff regularly performed compounding and completed prescriptions with no supervision

87.     Based on Relator's observations, approximately 80% of all patients at All Heart were federal healthcare program beneficiaries. Of those, 60% of patients were Medicare Part D beneficiaries, 30% were Medicaid beneficiaries, and approximately 10% were TRICARE beneficiaries.

        2.     Med-Care Defendants

88.     Relator discovered the conduct of the Med-Care Defendants through descriptions from former and current employees, including Ms. Shenoda herself. During Relator's initial interview at All Heart, for example, Ms. Shenoda told Relator that she was close with the owners and founders of Med-Care and Med Solutions, Akram and Ahmad Girgis, attending church together and frequently socializing. Ms. Shenoda mentioned that prior to starting All Heart Pharmacy, she had worked at Med-Care for approximately eight years as a pharmacist.

89.     Throughout Relator's two years at All Heart, Ms. Shenoda often bemoaned All Heart's status vis-à-vis- the pharmacy of her long time former employer, Med-Care. Ms.

Shenoda explicitly noted that the All Heart business model – producing high reimbursement topicals, and paying third party companies to access federal healthcare program beneficiaries – was based on the practices of Med-Care and Med Solutions.

90.     Ms. Shenoda, however did not initially have confidence navigating reimbursement for compounded pharmaceuticals, emphasizing to Relator and others that Med-Care and Med Solutions had honed formulas for extremely profitable compounded pharmaceuticals. Ms. Shenoda would show Relator and other All Heart employees photos of prescriptions demonstrating the high reimbursement rates for the compounded prescription topicals received by Med-Care, with some prescriptions receiving as much as $14,000 per unit.

91.     By Ms. Shenoda's description, Med-Care and Med Solutions set a formula for these compounded pain or dry skin creams to maximize federal reimbursements. Because compounded pharmaceuticals are reimbursed differently under various Part D plans, Med-Care and Med Solutions would "test" various formulas with different insurers before beginning mass production of a cream. In sum, rather than customizing these compounded formulas on a per patient basis, these creams were inappropriately produced based on pre-set formulas, chosen for maximum profitability with minimum risks. The opportunity for profit, when compounded creams were produced in this manner, could be hundred-fold.

92.     Ms. Shenoda's descriptions were corroborated by accounts of Med-Care and Med Solutions staff. From 2016-2017, an employee shared by Defendants All Heart, Med-Care and Med Solutions visited All Heart on a weekly basis to assist with IT maintenance. Relator was often present as Ms. Shenoda would badger the employee for updates on Med-Care and Med Solutions' business, and on multiple occasions asked the employee to find a way to copy their most profitable compounding formulas for her. To Relator's knowledge, Ms. Shenoda was not able to acquire the Med-Care compounding formulas.

21

93.     Based upon her conversations with Ms. Shenoda, Relator understood that Defendants Med-Care and Med Solutions similarly relied upon federal healthcare programs to drive their revenue.

**B.     Defendants paid millions to third party companies to identify and target federal beneficiaries as new patients, and often secured these new patient prescriptions through harassment and lies.**

94.     To push the sales volume of their pharmaceutical creams, Defendants paid kickbacks to third party companies to target and access federal healthcare program beneficiaries. These third party companies – also known as "lead generation companies" – gathered consumer information through late night television advertisements and internet surveys, under the guise of collecting information to provide patients with information or products tailored to their health conditions.

95.     The lead generation companies would then sell highly specific patient data to interested parties, including Defendant pharmacies. This information, or "lead", included detailed information about the patient (name, date of birth, address, current health conditions), the patient's physician (NPI, name, address, phone and fax number) as well as the patient's insurance information (bank identification number or "BIN", processor control number or "PCN", group number, and Medicare ID number).

96.     These leads therefore allowed Defendants to target patients with insurance associated with federal healthcare programs and whom had reported pain or dry skin issues. These leads also provided the necessary information to contact a patients' physician to secure a prescription.

          1.     All Heart Defendants

97.     Defendant All Heart Pharmacy, for example, almost exclusively purchased leads for patients whom had indicated they had pain, dry skin, and – based upon insurance information – were federal program beneficiaries. Based on conversations with Ms. Shenoda, Relator learned that All Heart purchased leads for at least 30 patients a day, at the rate of $150 per patient, on a daily basis. At that rate, per year All Heart – an operation with only one licensed pharmacist –

spent approximately $1 million dollars per year on these marketing and promotional activities alone.

98.     Once the All Heart Defendants had purchased access to these patients, All Heart Defendants would then engage in an aggressive – and at times purposefully misleading – campaign to contact patients and their doctors to secure a prescription for these expensive compounded pharmaceuticals.

99.     All Heart Defendants, for example, would first seek consent from beneficiaries to secure a prescription from their physician. Relator and other All Heart staff were directed to make these calls. When patients were not interested in the creams, Ms. Shenoda directed Relator and other All Heart staff to imply – falsely – that the patients' doctor had suggested the prescription.

100.     On calls with these prospective patients, Relator and other All Heart staff were also directed to promise that the prescriptions would be paid for by the patient's insurance. If a patient asked whether there was a co-pay, All Heart staff were directed to tell patients that there would be no out of pocket costs.

101.     Initially, Relator would tell Ms. Shenoda that she felt uncomfortable making these calls and promises. Ms. Shenoda dismissed these complaints, insisting to Relator that other pharmacies made these types of calls, and that as a pharmacist, she had a discretion to waive co-pays. As described below, however, by 2017 Ms. Shenoda was directing Relator and other employees to fabricate backdated co-pay invoices to conceal this conduct.

102.     During calls, Relator discovered that many patients had no idea where All Heart had received their information, and had no memory of consenting to be contacted. The majority of patients were elderly.

103.     A number of patients relayed to Relator that representatives from the lead generation company suggested they had been in contact with the patients' physician regarding their prescriptions, and determined the patient was a good candidate for these drugs based upon these conversations. Other patients reported representatives suggesting that they were health

23

practitioners who could verify that the claims for the prescriptions were "pre-approved," or were representatives from the patient's insurance company. To Relator's knowledge, those representations would have been false.

104.    To Relator's knowledge, All Heart Pharmacy only used one lead generation company at a time, and changed lead providers two or three times from 2016-2018. Ms. Shenoda closely guarded the information regarding the lead companies, and no one but Ms. Shenoda knew the provider's contact information or identity.

105.    In 2017, Ms. Shenoda requested Relator's help to create a call center in Wellington, Florida. The sole purpose of the new call center would be to call "leads" for Uptown Pharmacy, which was also owned by Ms. Shenoda and served patients in Michigan. Ms. Shenoda described plans to staff the center with four or five full time callers, and to eventually have the center call and recruit patients for all of her pharmacies, including All Heart and All Family. Ms. Shenoda abruptly ceased seeking Relator's help on this project, and ceased speaking to Relator about this project, in 2017. Relator later learned from a co-worker that Ms. Shenoda believed Relator "asked too many questions."

### 2.    Med-Care Defendants

106.    Relator understood that Med-Care Defendants similarly paid for access to patients based on her first hand experience, and discussions with current and former employees.

107.    In 2016, for example, Relator was briefly hired as a pharmacy technician at Defendant Med Solutions. Upon arrival on her first day, Ms. Boone was surprised that her much of her job consisted of calling "patient leads" and pitching the pharmacy's select compounded pharmaceuticals. Uncomfortable at the prospect of acting as more of a marketer than a pharmacy technician, Ms. Boone left within the day.

108.    As noted above, Ms. Shenoda repeatedly and explicitly noted to Relator and other employees that All Heart replicated Med-Care's practices, including the use of lead companies to purchase federal beneficiary information.

24

109.   Ms. Shenoda noted that the script for calling patients provided to staff at All Heart had been provided to her by Med-Care.

110.   Med-Care and Med Solutions' practice of purchasing patient leads was also verified by a current Med-Care employee during a lunch on March 16, 2018 which included Relator, Ms. Shenoda and other All Heart employees.

111.   Relator and Ms. Shenoda would also regularly discuss Med-Care's business practices – including the honing of compounding formulas, and the use of lead companies – with IT personnel shared by Defendants Med-Care and All Heart. From 2016-2017, these conversations occurred on nearly a weekly basis.

C.   **All Heart Defendants sought, and received, reimbursements for prescriptions that were not based on valid patient consent, a valid practitioner-patient relationship, and/or valid prescriptions.**

112.   After speaking to the patients, All Heart Defendants would then relentlessly contact the beneficiaries' physician, making daily calls and faxes with pre-filled prescriptions until the practitioner signed the prescription. At times, All Heart Defendants falsely suggested to practitioners that the patient had pro-actively requested these prescriptions.

113.   During these calls to patients and practitioners, All Heart Defendants did not verify that these prescription pharmaceuticals were medically necessary, or that these prescriptions had been made pursuant to a valid practitioner-patient relationship.

114.   To Relator's knowledge, no beneficiaries – including Medicare beneficiaries -- were counseled by All Heart on their drug history, potential cross interactions with drugs, or potential side effects of the compounded pharmaceuticals.

115.   Hundreds of patients and physicians complained directly to All Heart about their practices. Patients would call complaining they had not consented to contact, and in some instances, would return prescriptions complaining they did not need or want the drugs. Patients also were often surprised when they received payment requests from their insurance, as All Heart routinely implied that patients would have no payment responsibility when a cream was only partially covered.

25

116.     Physicians called All Heart complaining of harassment. On one occasion, Relator learned that a physician was contacted by All Heart, including repeated requests for patient charts – an unusual request from a pharmacist. The physician directly contacted Ms. Shenoda, threatening to contact the FBI regarding these suspicious and aggressive requests. Ms. Shenoda replied – as Relator often witnessed her do in response to complaints – by acting as though the contact and requests were merely mistakes.  Relator believed that Ms. Shenoda was seeking these charts in response to the CVS audit, which had raised concerns regarding physician attestations and a lack of the necessary patient-pharmacist relationship.

117.     As described below, All Heart's insurers – including Part D Sponsor CVS Caremark – also received complaints that reimbursed prescriptions had not been requested by patients or actually prescribed by physicians.

118.     At Defendant All Heart Pharmacy, prescriptions were also regularly issued and filled when the sole licensed pharmacist on staff – Ms. Shenoda – was not on premises, nor readily accessible. Relator and other staff regularly performed compounding and completed prescriptions with no supervision. On average, Ms. Shenoda was only on premises or accessible less than half the day. When Ms. Shenoda was not present, she was often 45 minutes to an hour away in Fort Lauderdale, where her husband's medical practice was located. Relator witnessed periods where Ms. Shenoda was absent for weeks at a time, during which All Heart's pharmacy technicians would nevertheless continue issuing and filling prescriptions.

119.     During a March 16, 2018 lunch, Ms. Shenoda also mentioned to Relator and other All Heart employees that she believed Med-Care and Med Solutions regularly had compounded prescriptions signed by practitioners from a telemedicine service – TeleDoc – rather than the beneficiary's primary care physicians. To Ms. Shenoda's knowledge, these telemedicine services had no prior relationship to beneficiaries, and were paid directly by Med-Care and Med Solutions for this service.

   **D.**     **Defendants routinely waived co-pays for patients, and made little to no effort to collect co-pays, in order to induce referrals. When audited by Medicare**

**Part D plan sponsors, Defendants falsified backdated invoices to conceal the conduct.**

### 1. Waiver and Failure to Collect Co-Pays

120. After sending compounded creams to these targeted patients, Defendants also routinely made little to no effort to collect co-pays from patients for these prescriptions.

121. In fact, All Heart Pharmacy routinely told patients the creams would cost them nothing.

122. At Defendant All Heart Pharmacy, Relator witnessed little to no invoicing of patients until February 2018, when Part D Sponsor CVS Caremark began to raise concerns regarding All Heart's failure to collect co-pays.

123. In early 2018, a new All Heart staff member tasked with handling co-pay issues warned Ms. Shenoda that a routine failure to collect co-pays was illegal. Ms. Shenoda dismissed these concerns.

124. As detailed below, current and former employees at Med-Care and Med Solutions described similar practices. In October 2016, a former Med-Care employee joined All Heart, and confided in Relator that Med-Care similarly failed to collect co-pays for years. These accounts were corroborated by a current Med-Care and Med-Solutions employee involved in billing and invoicing at a March 16, 2018 business lunch.

125. When their routine waiver of co-pays was questioned by auditors, employees at Med-Care and Med Solutions described falsifying back-dated invoices to avoid detection of the conduct, and suggested All Heart do the same.

### 2. Defendants Falsified Backdated Invoices to Conceal the Kickbacks

126. Beginning in late 2017, CVS Caremark – a Part D Sponsor whom had paid claims to Defendant All Heart – began questioning All Heart Pharmacy's practices. For several months, CVS Caremark began auditing records for approximately three patients a week, for whom All Heart had sent – and received insurance reimbursement for – prescription calcipotriene cream.

27

For each of these records, CVS Caremark noted a failure to collect co-pays and inquired about All Heart's effort to collect these co-pays.

127.    After receiving these audit requests, Ms. Shenoda contacted staff at Med-Care and Med Solutions, asking what she should do, and how Med-Care and Med Solutions had responded to similar questions from auditors. During these conversations, Ms. Shenoda was told that she had to create an appearance of attempting to collect co-pays. At least two long-time staff members at Med-Care and Med Solutions revealed that they regularly created falsified back-dated invoices to that end, and in fact had a credit card machine programmed to create these invoices *en masse.*

128.    Ms. Shenoda followed this advice, and described these conversations to Ms. Boone as she directed her to fabricate fake back-dated invoices for CVS Caremark. Relator did so, understanding that if she refused, she would be terminated.

129.    Ms. Shenoda also confided to Relator that she had fraudulently charged co-pays to patient credit cards that All Heart had on file, and immediately refunded the co-pays back. Ms. Shenoda provided, however, the invoices creating an appearance of a charge to CVS Caremark in this audit.

130.    In February 2018, CVS Caremark launched a larger audit into a number of specific issues at All Heart, again focusing on claims for prescription calcipotriene creams. These issues included All Heart's failure to collect co-pays, doctors complaining they hadn't actually written prescriptions for orders, patients complaining they had not received prescriptions, and All Heart's routine practice of sending orders by mail when it was a retail, and not mail order pharmacy.

131.    Ms. Shenoda again directed Relator to falsify back dated invoices in response to the audit.

132.    Of the patients audited, 90% were part of either CVS' WellCare or StayWell programs, which respectively served only Medicare Part D or Medicaid beneficiaries.

133.    Throughout the audit process, Ms. Shenoda frequently and openly complained to Relator and other All Heart employees that it wasn't "fair" that All Heart was subject to such scrutiny when Med-Care and Med Solutions were "so much worse" and had operations at a much more significant scale. According to Ms. Shenoda, Med-Care and Med Solutions frequently failed to even mail out prescriptions which they had billed federal healthcare programs for, and simply reused medication which had been returned.

### 3.    Relator Alerted Auditors and Federal Authorities to the Conduct

134.    On July 19th, 2018, Relator submitted a written tip to HHS-OIG via their website. In her tip, Ms. Boone noted the concerns described in these allegations, including the payments for patient "leads", the routine waiver of co-pays, the falsification of co-pay invoices, lack of medical necessity of the creams and other issues. Ms. Boone identified her first hand experience of these practices at Defendant All Heart Pharmacy, as well as the various conversations from Ms. Shenoda and others describing similar conduct by Defendants Med-Care, Med Solutions, and Uptown Pharmacy.

135.    In July 2018, Ms. Boone also reached out to CVS Caremark's lead auditor – Jennifer Thomas – to alert her that All Heart had in fact fabricated co-pay receipts and invoices. Through e-mail and text over the following months, Ms. Boone relayed her concerns regarding Defendant's conduct.

136.    In August 2018, Ms. Boone was terminated from All Heart over pay and leave disputes.

137.    On information and belief, following Ms. Boone's departure, CVS Caremark later requested at least $300,000 in claims paid out to All Heart to be returned, and reached approximately a $220,000 settlement for payment of these claims.

138.    On information and belief, another insurer – Optum – terminated its contract with Defendant All Heart in August of 2018, as a result of audit findings concerning co-pay waivers,

patients and doctors denying writing or receiving prescriptions, and frequent mailing of prescriptions despite being a registered retail and not mail order pharmacy.

139.    In November of 2018, Ms. Boone was contacted by OIG-HHS agents to discuss her allegations in further detail. Ms. Boone met with agents again in December 2018 at their request, and spoke approximately a dozen times via phone with agents. During these meetings and phone calls, OIG-HHS agents asked Ms. Boone extensively about the conduct of Ms. Rasha Shenoda and All Heart Pharmacy, as well as her knowledge regarding the conduct of Med-Care and Med Solutions. Ms. Boone relayed the information she was aware of, including the allegations described in this Complaint.

**E.      Defendants violated the False Claims Act and the Anti-Kickback Statute.**

140.    Defendants knowingly and willfully violated the Anti-Kickback Statute by purchasing referrals to Medicare, Medicaid and TRICARE patients via third party lead generation companies. Defendants specifically targeted federal beneficiaries when purchasing leads and marketing services, paying millions in exchange for the data of patients whom had been identified as having pain or dry skin conditions, and were part of these federal healthcare programs. When confronted with questions about these practices, or complaints from patients and physicians, Defendants All Heart and Ms. Shenoda dismissed concerns and continued purchasing patients and billing federal programs.

141.    Defendants also knowingly and willfully violated Anti-Kickback Statute by routinely waiving co-pays for these patients. When this conduct was questioned by insurance auditors, Defendants repeatedly concealed their wrongful conduct through falsifying records – back-dated invoices – to retain their payments from federal healthcare programs.  Defendants even immediately refunded those co-payments back to patients to keep the patients from complaining and keep their promise that it would cost the patient nothing, which fraudulently representing that they co-payments were made.

142.    Defendants knowingly submitted false claims to Medicare, Medicaid and TRICARE where prescriptions were made when not medically necessary, were not made

pursuant to a valid practitioner-patient relationship, and / or compounds were reimbursed in absence of a legally valid prescription. Pursuant to Florida law, a prescription could not be valid where a licensed pharmacist was not available.

143.    In failing to comply with these requirements, and participating in the above described schemes, Defendants have failed to comply with terms that are at the essence of the bargain to the government, and if the government had known, would have been material to the government's decision to pay.

144.    Recently, schemes using compounded topicals have been of particular concern to HHS-OIG, which noted that it has been "involved in an increasing number of fraud cases related to compounded drugs." *See* U.S. Dept. of Health and Human Services, OEI-02-16-00440, *Questionable Billing for Compounded Topical Drugs in Medicare Part D* 1 (2018). In this same report, OIG-HHS also noted "safety and effectiveness concerns related to compounded drugs, which are not FDA-approved." *Id.* Indeed, the Department of Justice has pursued and/or intervened in numerous cases involving fraudulent pharmaceutical compounding in recent years, many of which also include improper kickback payments related to marketing and patient solicitation. *See e.g. U.S. ex rel. Medrano v. Diabetic Care Rx, LLC*, Case No. 15-62617-CIV-BLOOM, S.D.Fl. (Mar. 5, 2018); *United States ex rel. Knopf v. AgeVital Pharmacy, LLC et al.*, Case No. 8:15-cv-2591-T-36JSS (M.D. Fla.); *United States ex rel. McKenzie Stepe v. RS Compounding LLC, Renier Gobea*, Case No. 8:13-cv-3150-T-33AEP (M.D. Fla.).

**Count I**
**False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A)(B)(C) & (G)**

145.    Relator realleges and incorporate by reference the allegations contained in paragraphs 1 through 144 above as though fully set forth herein.

146.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

147.     By and through the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

148.     By and through the acts described above, Defendants knowingly made, used or caused to be made or used, false statements or records material to false or fraudulent claims.

149.     By and through the acts described above, Defendants conspired, and agreed together with others to defraud the United States by knowingly causing false and illegal claims to be submitted to the United States for the purpose of having those claims paid and ultimately profiting from those false claims. Defendants committed other overt acts set forth above in furtherance of these conspiracies.

150.     By and through the acts described above, within the meaning of the False Claims Act, Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

151.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

152.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

153.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein occurring prior to November 2, 2015, and $21,563 for each violation occurring after.

**Count II**
**Florida False Claims Act and Florida Medicaid False Claims Act**
**F.S.A. § 68.081 *et seq.***

154.     Relator realleges and incorporate by reference the allegations contained in paragraphs 1 through 144 above as though fully set forth herein.

155.    This is a claim for treble damages and penalties under the Florida False Claims Act and Florida Medicaid False Claims Act.

156.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

157.    By and through the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the Florida State Government.

158.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

159.    The Florida State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

160.    Defendants have damaged, and continue to damage, the State of Florida in a substantial amount to be determined at trial.

161.    Additionally, the Florida State Government is entitled to the maximum penalties pursuant to the Florida False Claims Act and the Florida Medicaid False Claims Act for each and every violation alleged herein.

VI.    **PRAYER**

WHEREFORE, *qui tam* Relator prays for judgment against the Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 occurring prior to November 2, 2015, and not less than $10,781 and not more than $21,563 for each violation of 31 U.S.C. § 3729 occurring after November 2, 2015.

3.      That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act, as well as under the Florida False Claims Act and Florida Medicaid False Claims Act, F.S.A. § 68.081 *et seq.*

4.      That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.      That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, *qui tam* Relator Amber Boone hereby demands a trial by jury.


Dated:  April 12, 2019


Respectfully submitted,


Jeffrey W. Dickstein
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
Bar No. 434892
jdickstein@phillipsandcohen.com

Amy L. Easton
Rebecca P. Chang
PHILLIPS & COHEN LLP
2000 Massachusetts Ave NW
Washington D.C. 20036
Tel:  (202) 833-4567
aeaston@phillipsandcohen.com
rchang@phillipsandcohen.com

Attorneys for *Qui Tam* Plaintiff Amber Boone


34